STATE of Missouri, Respondent,

v.

Paul HARPER, Appellant.

No. 63374.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 16, 1994.

Susan K. Eckles, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

KAROHL, Judge.

Defendant was charged, jury tried and convicted of four counts of stealing over $150 by deceit, in violation of § 570.030 RSMo 1986. Defendant argues one claim of error as a ground for a new trial. We find all elements of the charges were proven and affirm.

Viewed in the light most favorable to the verdict, the record discloses that defendant Paul Harper owned and operated the Gateway Dance Studio (Gateway) in St. Louis County from 1988 through 1990. Gateway employed co-defendant Eric Wilhelm as manager and dance instructor. Gateway also employed other dance instructors, several of whom had little or no experience when hired, while others seemed experienced and qualified.

Gateway was in the business of teaching ballroom dancing. It enticed new students into taking lessons by routinely placing advertisements for introductory lessons in the newspaper, typically offering ten to twenty lessons for $10. Gateway aimed its advertisements predominantly at women over the age of forty. These women were rated by the instructors as "qualified," meaning a woman over forty with some financial backing; "double qualified," meaning a woman "somewhat" over forty with "obvious" financial backing; or, if neither of those characteristics fit a student, they would not be rated at all.

Gateway had policies and procedures designed at moving a new student towards more and more expensive dance lesson programs. By the close of the third introductory lesson, the instructor was to have sold the next level (the "Social Ease") consisting of 60 lessons for approximately $660. In theory, any remaining introductory lessons would roll over into the Social Ease program. Then, by the close of the seventh lesson of the Social Ease program, the instructor was to have sold the student a Bronze level program for approximately $5,500. Again, the remaining Social Ease lessons would be rolled over into the Bronze program. Next was the Silver level consisting of 100 lessons and several parties for $5,600. The Gold level followed the Silver and students also purchased numerous vacation packages, spotlight dances, trips to dance competitions and membership in the Outside Party Club consisting of events outside the studio, for example, dinner and dancing at a local club.

Because the instructors were to sell the next lesson program by a certain lesson of the existing lesson program, no organized lesson plans existed for any of the remaining lessons. The Social Ease program was to be sold by the third introductory lesson; and no lessons existed in the Gateway manual for lessons four through twenty. Since the Bronze level program was to be sold by the seventh lesson in the Social Ease level, no lesson plans existed in the Gateway manual for any lesson after number seven.

If students stopped spending additional money and wanted to use their existing lessons before purchasing another expensive program, those students would be put in the "back end." In the "back end," students found it difficult to actually receive further lessons because Gateway often cancelled lessons and made it difficult to schedule lessons. Instructors would also attempt either to force students to spend more money or to stop coming to the studio altogether, thereby not receiving all of the lessons they had purchased.

The Gateway instructors were trained in ways which enabled them to get new students to reveal personal and financial information, thereby giving the instructor an opportunity to rate those students and to design a plan to sell as many lesson programs as quickly as possible to those students. Everything the instructor did or said was planned and done to increase sales. Instructors were trained to endear themselves to their students. They always walked a student to her car after a lesson, hugging or kissing that student on the cheek when saying goodbye. The instructors were told to place extremely personal telephone calls to students in the late evening or early morning hours. The strategy behind these calls was to create an intimate atmosphere because the students were more vulnerable under these circumstances. Instructors were also told to send numerous personal cards to students and to pretend to be falling in love with them. Students were urged to buy more and more expensive dance programs in order to be able to spend more time with their instructor.

All these ploys were designed to make the students feel a very close bond with the instructor therefore making them more willing to spend money to please the instructor. When students wanted to stop spending money, this bond would enable the instructor to more easily make the students feel guilty about the decision and more willing to take financially risky steps in order to procure the needed funds. When students told instructors they could no longer afford more lessons, Gateway personnel strongly suggested they sell investments, take second mortgages or borrow the money in some other manner.

If a student firmly decided to spend no more money at the studio, the instructor then employed what was termed "desert treatment." This meant the student was treated meanly and rudely by the instructor and Gateway personnel, ignored altogether, tripped while dancing, made fun of, or a variety of other crude acts aimed at making the student not desire to come to the studio anymore, thereby foregoing unused lessons.

Defendant was charged (along with others), tried and convicted of four counts of stealing by deceit, a violation of § 570.030 RSMo 1986. He was tried along with co-defendant, Eric Wilhelm. The jury returned a guilty verdict on all four counts. Defen-

dant was sentenced to pay a total fine of $8,000 and to serve a total of four years and six months in jail.

■■■ Defendant's only claim of error challenges the sufficiency of the evidence produced at trial to prove he "purposely and falsely represented to [four named students] that they had the need for and the ability or opportunity to complete a certain number of hours of dance lessons; that he did not believe this to be true" and that students relied on these false representations and were induced to pay money to defendant. We do not weigh any evidence presented at trial but accept as true all the evidence which tends to support the guilty verdict together with all reasonable inferences drawn therefrom. We ignore all evidence contrary to the verdict. *State v. Sladek,* 835 S.W.2d 308, 310 (Mo. banc 1992), *State v. Isom,* 660 S.W.2d 739, 740 (Mo.App.1983). We will affirm the judgment based on a verdict if it is supported by substantial evidence. *Isom,* 660 S.W.2d at 740. Because the defendant's subjective intent at the time of the crime's commission is not directly ascertainable, it may (and often must) be shown by circumstantial evidence. *State v. Lue,* 813 S.W.2d 922, 925 (Mo.App. 1991).

One commits the crime of stealing over $150 by deceit by:

[A]ppropriat(ing) property or services of another with the purpose of depriving him thereof, either without his consent or by means of deceit or coercion. Section 570.-030 RSMo 1986.

Furthermore, "deceit" is defined in § 570.-010(6) RSMo 1986 as:

[P]urposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, or intention or other state of mind.... Deception as to the actor's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise.

Defendant argues the students both enjoyed their dance lessons and benefitted from them. He contends most of the students read the contracts and were fairly intelligent individuals. He claims the contracts themselves provided customers with protection, including an arbitration clause and 72-hour cancellation clause. These are matters for the jury. Even if true, they are not legal defenses to the charges of stealing by deceit. If the state proved the elements of the charged crime, these matters are not legally significant.

■■■ Defendant attempted to discredit the state's witness, dance instructor Bill Brown, because he was given immunity from prosecution in exchange for his testimony. This contention will not help defendant; it relates to a re-argument on witness credibility. On appeal, we do not determine witness credibility nor weigh evidence. *State v. Villa–Perez,* 835 S.W.2d 897, 902 (Mo. banc 1992). Such a determination is rightly in the domain of the jury.

Defendant argues he merely exploited an existing need in the women clients and his studio behaved like any other profitable business venture in a capitalist society. Defendant also argues he targeted women over forty because they were the most likely to enjoy ballroom dancing. However, ample evidence was presented to the jury from which it inferred the women were targeted and specifically manipulated based on their finances, age, marital status and loneliness to purchase lessons that did not exist and would not be produced. He analogizes the countless personal cards, letters and phone calls feigning love and romanticism to the "friendly" birthday cards some businesses send their customers. The jury did not accept this explanation.

Defendant now admits his studio and employees used "downright obnoxious" methods to make sales and that some employees possessed the "social sensitivity of a Neanderthal." However, defendant contends the women got what they paid for; and for those who quit, they did so of their own volition. Interestingly, in his brief, defendant seems to want to argue both ways on this issue. He states the treatment the women received was not so "obnoxious" because, if it were, they would not have continued taking lessons. He argues the women could have "stopped patronizing the studio altogether"

as a way to rid themselves of the abusive treatment they received by rejecting additional programs. But defendant also recognizes the fact the women did eventually decide to stop going to Gateway when they had existing lessons owed to them.

■ₒ The only pertinent inquiry on appeal is whether sufficient evidence was presented to the jury from which it could convict the defendant of stealing by deceit. There was evidence from which the jury could find defendant, acting with others, appropriated large sums of students' money with the purpose of depriving them of that money by using false representations upon which the victims relied. Sections 570.030 RSMo 1986, and 570.010(6) RSMo 1986. Defendant sold dance lesson programs. Each program consisted of a stated number of lessons, some of which did not exist and defendant never intended to provide. No lessons existed in Gateway's manual for any lessons in a program after the point at which a student was to have purchased the next program. After that point, a student was to be put in the "back end." The evidence supported a finding that when the money stopped, the lessons stopped according to a plan designed before false representations were made to gain additional payment. The crimes were committed the moment defendant sold and received payment for lesson programs knowing a student would never receive the promised, but nonexistent lessons. The state proved each element of the crimes, including intentional false representations as part of a scheme to steal. *See State v. Small,* 873 S.W.2d 895, 897–98 (Mo.App.1994).

Affirmed.

AHRENS, P.J., and SIMON, J., concur.